IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF MISSISSIPPI
ABERDEEN DIVISION

YASHIA CULBERSON, INDIVIDUALLY
AND ON BEHALF OF ALL HEIRS-AT-LAW
AND WRONGFUL DEATH BENEFICIARIES
OF DALE O'NEAL, DECEASED AND
THE ESTATE OF DALE O'NEAL                                              PLAINTIFFS

v.                                              CIVIL ACTION NO. 1:21-CV-114-SA-DAS

CLAY COUNTY, SHERIFF EDDIE SCOTT,
IN HIS INDIVIDUAL AND OFFICIAL CAPACITY,
OFFICER TIM TOWNSEND IN HIS INDIVIDUAL
AND OFFICIAL CAPACITY, OFFICER ANNIE AVANT
IN HER INDIVIDUAL AND OFFICIAL CAPACITY,
OFFICER CYNTHIA MYLES IN HER INDIVIDUAL
AND OFFICIAL CAPACITY AND OFFICERS AND JAIL
EMPLOYEES JOHN AND JANE DOES 1-5, IN
THEIR INDIVIDUAL AND OFFICIAL CAPACITIES
REPRESENTING JAIL GUARDS OF THE CLAY
COUNTY JAIL AND/OR OTHER EMPLOYEES,
INCLUDING SUPERVISORY OFFICIALS WHOSE
IDENTITIES ARE CURRENTLY UNKNOWN                                        DEFENDANTS

ORDER AND MEMORANDUM OPINION

This civil action stems from the March 15, 2019 death of Dale O'Neal at the Clay County

Detention Center in West Point, Mississippi. On July 15, 2021, Yashia Culberson, individually

and on behalf of all heirs-at-law and wrongful death beneficiaries of Dale O'Neal, deceased, and

the Estate of Dale O'Neal (collectively "the Plaintiffs") brought suit against Clay County, Sheriff

Eddie Scott in his individual and official capacities, and Jail Employees John Does 1-5. With leave

of court, the Plaintiffs filed their Amended Complaint [33] on April 21, 2022, additionally naming

as defendants Officer Tim Townsend, Officer Annie Avant, and Officer Cynthia Myles, in their

individual and official capacities.[1] The Defendants have filed Motions [103], [106], [108], [110]

---

[1] Officer Townsend was dismissed from this action *without prejudice* on September 29, 2022 for failure to
serve process. *See* [58].

seeking dismissal of all claims against them. The Motions [103], [106], [108], [110] have been fully briefed and are ripe for review.[2]

*Relevant Factual and Procedural Background*

Dale O'Neal was arrested on March 8, 2019, by the West Point Police Department and transported to the Clay County Detention Center. He was arrested pursuant to a bench warrant for failure to appear issued by the Municipal Court of West Point, Mississippi, and on an arrest warrant for a trespassing charge that was issued by the Clay County Justice Court. On March 12, 2019, he appeared before the Municipal Court and was ordered to serve four more days in jail and post a cash bond. The Municipal Court ordered that he be released on March 15, 2019. On March 14, 2019, O'Neal appeared before the Clay County Justice Court and was ordered to be released with time served on that day. Therefore, due to the Municipal Court's Order, O'Neal's Release Certificate states that he was to be released on March 15, 2019, at 8:00 a.m. *See* [110], Ex. 1.

While O'Neal was in custody, on March 13, 2019, Cameron Henderson was arrested by Officer Parker Smith of the West Point Police Department. Henderson was arrested for disturbing the peace of a business and also pursuant to an outstanding warrant for shoplifting. Describing Henderson's arrest at his deposition, Officer Smith testified that on March 13, 2019, he was dispatched to 5 Star Deli when Henderson's grandmother called 911 and said that Henderson was

---

[2] There are two matters regarding the parties' briefs that the Court feels compelled to note. First, the Plaintiffs' Response [122] to one Motion [106] did not include a Memorandum in Support of their Response [122]. The Defendants therefore argue that their Motion [106] should be granted as unopposed because the Response [122] does not set forth any cognizable arguments. In accordance with the Local Rules, the Court will not grant a dispositive motion solely on the basis that it is unopposed. *See* L. U. Cɪᴠ. R. 7(b)(3)(E). Second, in addition to their original Response [118] to Officer Avant and Sheriff Scott's Motion [103], the Plaintiffs filed two Amended Responses [125], [126] without leave of court. The Amended Responses [125], [126] attach several appendices to the expert report that was attached to their initial Response [118]. The Court need not address whether the Amended Responses [125], [126] are properly before the Court. The Magistrate Judge granted the Defendant's Motion to Strike [85] the Plaintiffs' Expert Designation on March 28, 2023. *See* [132]. The Court affirmed the Magistrate Judge's Order [132]. *See* [156]. Therefore, the Court will not consider the expert report or the appendices attached in the Amended Responses [125], [126].

at the deli threatening her with a knife.[3] As Officer Smith arrived at the business, he witnessed Henderson "trying to push his way into the door" and then successfully entering the store. [118], Ex. 6 at p. 6. Describing the events further, Officer Smith stated that, once inside the store, he saw Henderson "inside the clerk's face," who was his grandmother, "yelling and cussing at her." *Id*. Officer Smith testified that "[a]t that moment, [Henderson] began reaching into his pockets," and Officer Smith grabbed Henderson's hands to stop him due to the 911's caller statement that he had a knife. *Id*. Officer Smith then placed Henderson (whom he described as agitated) under arrest and placed him in the back of his patrol unit.

According to Officer Smith, on the night of Henderson's arrest, he interviewed Henderson's grandmother, Patty Kimbrough, as well as Henderson's other grandmother, Brenda Henderson, with whom Henderson had apparently traveled to the store. Kimbrough advised Officer Smith that Henderson "was coming off a two or three day high," and both grandmothers advised him that Henderson had threatened them with a knife. *Id*. at p. 8-9. Officer Smith confirmed that he found a knife on Henderson's person.

After arresting Henderson, Officer Smith transported him to the Clay County Detention Center and filled out a "Clay County Sheriff's Office Jail Intake Sheet," which he gave to Officer Annie Avant, the booking officer on duty on March 13, 2019. *See* [103], Ex. 2 at p. 7. The intake sheet listed a third charge—simple assault by threat—that was crossed out. At his deposition, Officer Smith stated that the third charge was crossed out because Henderson's grandmothers did

---

[3] The Court assumes that Henderson's grandmother Patty Kimbrough is the one who made the 911 call because Officer Smith testified that he listed her as the "complainant" in his police report. [122], Ex. 2 at p. 8.

not meet with his lieutenant to pursue the charge. At 2:30 p.m., Officer Avant assigned Henderson to cell "NLD 2"—the cell where O'Neal was housed. *See id*. at p. 5.[4]

On March 15, 2019, at 4:23 a.m., Officer Cynthia Myles performed "jail checks" and passed out medicine to inmates at the jail. [110], Ex. 4 at p. 30. When Officer Myles asked Henderson and O'Neal if they wanted something to drink, they both held their cups out of their cell flap and stood where she could see them.[5] Officer Myles' shift ended at 7:00 a.m. Shortly thereafter at 7:40 a.m.—less than an hour before he was due to be released—O'Neal was found unresponsive in his jail cell and later pronounced dead. It was subsequently determined that Henderson strangled O'Neal to death with the two-foot-long cord attached to the phone in their jail cell.[6]

According to Sheriff Scott, from the time he began working at the Clay County Sheriff's Office in 1999 until O'Neal's murder in 2019, no inmate or detainee had used a phone cord to kill a cellmate. *See* [103], Ex. 6 at p. 5.

Of additional importance in this case is a Chancery Court matter concerning Henderson that was filed on March 14, 2019—the day after Henderson was arrested and the day before O'Neal was murdered. On that day, Keith Kimbrough, Henderson's grandfather, filed a Motion and Application for the Emergency Commitment of the Respondent for Alcohol/Drug Addiction in the Chancery Court of Clay County. *See* [103], Ex. 5. The Motion sought to have Henderson

---

[4] The parties spend considerable time discussing the information that Officer Smith gave to Officer Avant, whether verbally or on the intake sheet, as well as the screening process that Officer Avant utilized when booking Henderson. The Court will discuss those facts in more detail below.

[5] The Defendants submitted, and the Court has reviewed, surveillance footage of Officer Myles making her rounds that morning. *See* [110], Ex. 5 and 6. The Plaintiffs subsequently dismissed their federal claims against Officer Myles. Therefore, while it has reviewed the video, the Court finds it is not relevant to the remaining claims.

[6] According to Sheriff Scott's deposition, Henderson has since been convicted for O'Neal's murder. *See* [110], Ex. 7 at p. 41-42.

committed because, his grandfather alleged, he "has lost the power of self-control with respect to the use of alcoholic beverages/habit forming drugs" and is likely to inflict physical harm upon himself or others unless immediately committed. *Id*. at p. 3-4. On the day the Motion was filed, the Chancery Court judge signed an Order directing the Clerk of Court to issue a Writ commanding the sheriff to take Henderson into custody and transport him to a physician for a physical examination for drug and alcohol commitment. *Id*. at p. 12. The fax report at the top of the documents shows that the Clerk's office faxed the Motion and Order to the Sheriff's Office at 9:54 a.m. on March 15, 2019—approximately two hours *after* O'Neal had been found dead. *See* [103], Ex. 5 at p. 1.[7]

The Plaintiffs filed suit in this Court on July 15, 2021. Their Amended Complaint [33] brings numerous claims against the Defendants under 42 U.S.C. § 1983 and Mississippi state law. In particular, the Plaintiffs assert that the Defendants "violated Mr. O'Neal's due process rights and/or exerted cruel and unusual punishment" when they assigned O'Neal a "mentally unstable cellmate that was known to have exhibited dangerous propensities" and otherwise failed to monitor and protect O'Neal from harm. [33] at p. 10.[8] The Plaintiffs allege that Clay County and Sheriff Scott are liable under *Monell* because they maintain customs, policies, and practices that

---

[7] The Court notes that the fax report only reads "09:54," without an a.m. or p.m. designation. *See* [103], Ex. 5 at p. 1. The Court assumes that the time on the fax report is in a 24-hour format and that the fax was sent at 9:54 a.m. In any event, whether sent at 9:54 a.m. or 9:54 p.m., the fax was transmitted after O'Neal's murder.

[8] The Court notes that the Plaintiffs' Amended Complaint [33] does not clearly state which Defendants the due process/failure-to-protect claim is lodged against. The factual statements under Count One only allege that "John Does" failed to protect O'Neal when they assigned Henderson to his cell. [33] at p. 10. As a result, Sheriff Scott and Officer Avant argue that that claim should be dismissed because it demonstrates that the Plaintiffs are asserting the claim against some other separate and distinct person. *See* [104] at p. 24. Sheriff Scott and Officer Avant further argue that the Plaintiffs' prefatory paragraph repeating and realleging all paragraphs above does not save the claim because, among other reasons, the preceding paragraphs clearly separate John Does' actions from those of Scott and Avant. The Court will not dismiss the Plaintiffs' claims on that basis because the Amended Complaint's [33] "Facts" and "Statements" sections allege actions of Scott and Avant that are pertinent to the failure-to-protect claim, including that they were involved in the booking process. *See id*. at p. 3-9.

demonstrate deliberate indifference to the constitutional rights of those like O'Neal—namely, policies regarding cell assignments for those with mental illness and policies regarding dangerous items in the jail. Similarly, the Plaintiffs allege that Clay County and Sheriff Scott failed to protect O'Neal by improperly training, supervising, and retaining jail employees. The Plaintiffs also bring claims for supervisory liability, failure to intervene, negligence, and wrongful death.

Through their Motions [103], [106], Clay County, Sheriff Scott, and Officer Avant seek dismissal of all federal claims against them. The Plaintiffs have withdrawn their federal claims against Officer Myles. *See* [123]. Through a separate Motion [108], the Defendants seek dismissal of all state law claims as well.[9]

*Analysis and Discussion*

The Court will first address the Motions [103], [106] seeking dismissal of the federal claims and thereafter address the state law claims.

I.      *Federal Claims*

Clay County, Sheriff Scott, and Officer Avant have filed Motions for Judgment on the Pleadings, or, alternatively, Motions for Summary Judgment [103], [106]. Sheriff Scott and Officer Avant raise the defense of qualified immunity with respect to all claims lodged against them in their individual capacities.

Though the Motions [103], [106] are styled as requests for judgment on the pleadings, or, alternatively, summary judgment, the parties have attached extensive documents that go beyond the pleadings. The Court will therefore apply the summary judgment standard. *See, e.g., Boateng v. B.P., PLC*, 779 F. App'x 217, 219 (5th Cir. 2019) (quoting FED. R. CIV. P. 12(d)) ("A district

---

[9] This Motion [108] was filed by Clay County, Sheriff Scott, and Officer Avant and joined by Officer Myles. *See* [113].

6

court converts a Rule 12(b)(6) motion to dismiss into a summary judgment motion when 'matters outside of the pleadings are presented to and not excluded by the court.'").

*A.  Summary Judgment Standard*

Summary judgment is appropriate where the movant shows "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56. The rule "mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986).

The movant bears the initial burden of "informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact." *Id.* at 323, 106 S. Ct. 2548. If the movant makes such a showing, the burden shifts to the non-movant to "go beyond the pleadings" and "designate specific facts showing that there is a genuine issue for trial." *Id.* at 324, 106 S. Ct. 2548. The evidence must be viewed and reasonable inferences must be drawn in the light most favorable to the non-moving party. *Crochet v. Bristol-Meyers Squibb Co.*, 804 F. App'x 249, 251 (5th Cir. 2020) (citing *Terrebonne Parish Sch. Bd. v. Mobil Oil Corp.*, 310 F.3d 870, 877 (5th Cir. 2002)).

*B.  Analysis*

At the outset, the Court feels compelled to clarify the claims asserted in the Amended Complaint [33], as it is not a model of clarity as to which claims are asserted against which Defendants. Reading the Amended Complaint [33] as a whole, it appears to the Court that the Plaintiffs assert the following federal claims: Fourteenth Amendment due process violation against Sheriff Scott and Officer Avant, *Monell* liability and failure to train against Clay County and

Sheriff Scott, supervisory liability against Sheriff Scott, and failure to intervene against Sheriff Scott and Officer Avant.

The Plaintiffs bring their federal constitutional claims pursuant to Section 1983. "[T]he United States Supreme Court has held that [Section 1983's] 'very purpose . . . was to interpose the federal courts between the States and the people, as guardians of the people's federal rights—to protect the people from unconstitutional action under color of state law.'" *Alexander v. McAdams*, 2017 WL 5642328, *3 (N.D. Miss. Apr. 18, 2017) (quoting *Mitchum v. Foster*, 407 U.S. 225, 242, 92 S. Ct. 2151, L. Ed. 2d 705 (1972)) (emphasis omitted). To state a claim under Section 1983, a plaintiff must "(1) allege he has been deprived of a right secured by the United States Constitution or the laws of the United States; and (2) demonstrate that the alleged violation was committed by a person acting under color of state law." *Weeks v. Thompson*, 2007 WL 316261, at *2 (N.D. Miss. Jan. 31, 2007) (citing *Cornish v. Corr. Servs. Corp.*, 402 F.3d 545, 549 (5th Cir. 2005)).

Undoubtedly, different standards are applicable to a Section 1983 claim against a municipality and an individual capacity claim against a law enforcement officer. *See Weeks*, 2007 WL 316261 at *2 ("Municipal liability under section 1983 requires proof of (1) a policymaker, (2) an official policy, and (3) a violation of constitutional rights whose 'moving force' is the policy or custom."); *Mangieri v. Clifton*, 29 F.3d 1012 (5th Cir. 1994) (holding that law enforcement officers are entitled to qualified immunity "unless it is shown that, at the time of the incident, [the officer] violated a clearly established constitutional right."). Nevertheless, whether seeking to impose liability against a municipality or an individual officer, a Section 1983 plaintiff must first allege that she has been deprived of a right secured by the United States Constitution or federal law.

*Victoria W. v. Larpenter*, 369 F.3d 475, 482 (5th Cir. 2004) (holding that in order to establish a Section 1983 claim, there must be "a deprivation of a right secured by federal law[.]").[10]

With these authorities in mind, the Court will first analyze whether the Plaintiffs have created a question of fact regarding the existence of a constitutional violation.

    *i.    Fourteenth Amendment Due Process/Failure-to-Protect Claim*

In Count One, the Plaintiffs allege that the Defendants violated O'Neal's constitutional rights by failing to protect him from harm. In particular, the Plaintiffs allege the following:

> 51. Defendants "John Does" violated Mr. O'Neal's due process and/or exerted cruel and unusual punishment in failing to properly assign him to a cell that was free from a mentally unstable cellmate that was known to have exhibited dangerous propensities, to properly monitor and protect Mr. O'Neal from life threatening harm, to properly search and prevent dangerous items from being possessed by Mr. O'Neal's cellmate, by denying to Mr. Henderson medication and failing to follow a Court order to get him a medical assessment before placing Mr. Henderson back into the cell occupied by Mr. O'Neal, to properly monitor O'Neal's cell and stop the vicious assault and strangulation. These acts were deliberately indifferent to the constitutional rights of Mr. O'Neal under the 5th, 8th, and 14th Amendments.

[33] at p. 10.

"[T]he Eighth Amendment's proscription against cruel and unusual punishment requires prison officials to protect inmates from violent attacks by other inmates." *Hinojosa v. Johnson*, 277 F. App'x 370, 374 (citing *Farmer v. Brennan*, 511 U.S. 825, 833, 114 S. Ct. 1970, 128 L. Ed.

---

[10] The Plaintiffs do not specify whether the claims against the individually-named Defendants are lodged against them in their individual capacities or official capacities. A claim against an official in his or her official capacity is indistinguishable from a claim against the municipality. *Bustillos v. El Paso Cty. Hospital Dist.*, 226 F. Supp.3d 778, 789 (W.D. Tex. June 6, 2016) (citing *Monell v. Dep't of Soc. Servs. of N.Y.C.*, 436 U.S. 658, 690, 98 S. Ct. 2018, 56 L. Ed. 2D 611 (1978)). Therefore, to the extent the Plaintiffs' claims are lodged against Sheriff Scott and Officer Avant in their official capacities, they are dismissed at the outset as they are redundant to the Plaintiffs' claims against Clay County. *See id.* (citing *Sanders-Burns v. City of Plano*, 594 F.3d 366, 373 (5th Cir. 2010)) ("Thus, when a plaintiff asserts claims against both the municipal entity and a municipal official in his or her official capacity, the Court can dismiss the official capacity claim as 'redundant' to the municipal-entity claim.").

2d 811 (1994)) (per curiam). "Although pretrial detainees like [O'Neal] are not protected by the Eighth Amendment, [the Fifth Circuit] ha[s] held that 'the State owes the same duty under the Due Process Clause of the Fourteenth Amendment to provide both pretrial detainees and convicted inmates with basic human needs, including . . . protection from harm, during their confinement.'" *Hyatt v. Thomas*, 843 F.3d 172, 177 (5th Cir. 2016) (citing *Hare v. City of Corinth, Miss.*, 74 F.3d 633, 650 (5th Cir. 1996)).[11]

Prison officials violate their duty to protect prisoners "only when two requirements are met." *Jason v. Tanner*, 938 F.3d 191, 195 (5th Cir. 2019) (quoting *Farmer*, 511 U.S. at 834, 114 S. Ct. 1970). "First, the deprivation alleged must be, objectively, 'sufficiently serious.'" *Farmer*, 511 U.S. at 834, 114 S. Ct. 1970 (citations omitted). That is, "the inmate must show that he is incarcerated under conditions posing a substantial risk of serious harm." *Id*. Second, the prison official must have acted with "deliberate indifference" to inmate health or safety. *Id*.

As to the second requirement, a prison official acts with deliberate indifference when he or she "knows of and disregards an excessive risk to inmate safety." *Id*. at 837, 114 S. Ct. 1970. "There are two necessary components: (1) 'the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists,' and (2) 'he must also draw the inference.'" *Williams v. Hampton*, 797 F.3d 276, 281 (5th Cir. 2015) (en banc) (citing *Farmer*, 511 U.S. at 837, 114 S. Ct. 1970). "Therefore, to avoid liability, '[p]rison officials charged with deliberate indifference might show. . . that they did not know of the underlying facts indicating a sufficiently substantial danger and that they were therefore unaware of a danger, or that they knew

---

[11] In their filings, the parties agree that O'Neal was a pre-trial detainee. The Court notes that the Plaintiffs briefly argue O'Neal was a civilian on March 15, 2019 at the time of his death because he was to be released on March 15, 2019. *See* [121] at p. 7. The Defendants disagree on the basis that O'Neal was not due to be released until 8:00 a.m. on March 15, 2019, and his murder occurred before that. Nevertheless, the parties otherwise agree that O'Neal was a pre-trial detainee while in custody.

the underlying facts but believed (albeit unsoundly) that the risk to which the facts gave rise was insubstantial or nonexistent.'" *Hyatt*, 843 F.3d at 177 (quoting *Farmer*, 511 U.S. at 844, 114 S. Ct. 1970).

"Furthermore, evidence that an official was aware of a substantial risk to inmate safety does not alone establish deliberate indifference." *Id*. "[P]rison officials who actually knew of a substantial risk to inmate health or safety may be found free from liability if they responded reasonably to the risk, even if the harm ultimately was not averted." *Id*. (quoting *Farmer*, 511 U.S. at 844, 114 S. Ct. 1970). Further, "[w]hile the obviousness of a risk is not conclusive and a prison official may show that the obvious escaped him, [] he would not escape liability if the evidence showed that he merely refused to verify underlying facts that he strongly suspected to be true, or declined to confirm inferences of risk that he strongly suspected to exist (as when a prison official is aware of a high probability of facts indicating that one prisoner has planned an attack on another but resists opportunities to obtain final confirmation[).]" *Farmer*, 511 U.S. at 843 n. 8, 114 S. Ct. 1970 (internal citation omitted).

"Deliberate indifference is an extremely high standard to meet." *Arenas v. Calhoun*, 922 F.3d 616, 620 (5th Cir. 2019) (quoting *Domino v. Tex. Dep't of Criminal Justice*, 239 F.3d 752, 756 (5th Cir. 2001)). "Deliberate indifference cannot be inferred merely from a negligent or even a grossly negligent response to a substantial risk of serious harm." *Torres v. Livingston*, 972 F.3d 660, 663 (5th Cir. 2020) (quoting *Williams v. Banks*, 956 F.3d 808, 811 (5th Cir. 2020)).

a. *Substantial Risk of Serious Harm*

The parties present no arguments regarding the first element of a failure-to-protect claim. O'Neal was murdered by his cellmate who apparently had violent tendencies. There is little question that he faced a substantial risk of serious harm. *See, e.g., Jason*, 938 F.3d at 195 ("Jason

sustained a serious head wound. So his injury meets the first requirement of the *Farmer* standard."). The parties' dispute centers on the second element of this type of due process claim—whether Sheriff Scott or Officer Avant acted with deliberate indifference.

      *b.*   *Deliberate Indifference*

Turning first to Sheriff Scott, the Plaintiffs make several allegations regarding his involvement in the events at issue. In their Memorandum [119], the Plaintiffs allege that Henderson was "assigned by Sheriff Scott" to O'Neal's cell and that, at the time of the assignment, Scott was aware of Henderson's mental instability and violent propensities. [119] at p. 3. The Plaintiffs further contend that Sheriff Scott failed to search Henderson and the jail cell for contraband and ignored a court order to take Henderson to a doctor. *Id*. at p. 4, 20. Although the Plaintiffs raise these arguments, they cite to no evidence to support the contentions.

Sheriff Scott argues that "[he] did not participate in Henderson's classification, and Plaintiffs cannot set forth any proof to show otherwise." [104] at p. 18. Overall, Sheriff Scott's deposition testimony makes it clear that he was not involved in Henderson's booking. *See, e.g.*, [110], Ex. 7 at p. 53-55 (discussing actions of booking officer). For example, Sheriff Scott testified as follows:

> Q.      And, so, when the booking officer, whoever the booking officer was, when they were booking Mr. Henderson in on this March 13th incident, they would have known about the September 26th detention of Mr. Henderson, correct?
>
> A.      Other than the information that's in front of them that we're looking at, that's all they would have known.

*Id*. at p. 23.

As to the Plaintiffs' contention regarding his alleged failure to comply with the Chancery Court Order, Sheriff Scott testified that the fax transmittal on the Chancery Court documents shows

that the jail did not receive the documents until after O'Neal's murder. *See* [110], Ex. 7 at p. 65-66. Indeed, the documents were attached to Sheriff Scott's Motion [103]. The fax report at the top of the document shows that the fax was sent at 09:54 on March 15, 2019.

Although the Defendants have come forward with this specific evidentiary support in favor of their position, the Plaintiffs have come forward with no *evidence* to rebut it. They have not contradicted Sheriff Scott's lack of involvement in Henderson's booking, nor have they presented any evidence demonstrating that he was otherwise aware of Henderson's presence at the jail, the danger he posed, or the Chancery Court filing. Without evidence that Sheriff Scott was subjectively aware of the substantial risk that Henderson posed to O'Neal, the Plaintiffs cannot create a question of fact as to whether Sheriff Scott acted with deliberate indifference to O'Neal's safety. *See, e.g., Walker v. Upshaw*, 515 F. App'x 334, 339 (5th Cir. 2013) (per curiam) (dismissing failure-to-protect claim against prison warden in his individual capacity where warden had no actual knowledge of danger posed to victim). Therefore, the Plaintiffs' Fourteenth Amendment claim against Sheriff Scott in his individual capacity is hereby DISMISSED.

This leaves the Plaintiffs' claim against Officer Avant. Again, to establish deliberate indifference, the Plaintiffs must show (1) that she was "aware of facts from which the inference could be drawn that a substantial risk of serious harm" existed and (2) that she actually drew the inference. *Williams*, 797 F.3d at 281 (citing *Farmer*, 511 U.S. at 839, 114 S. Ct. 1970). In *Farmer*, the Supreme Court explained the first sub-element as follows:

> Whether a prison official had the requisite knowledge of a substantial risk is a question of fact subject to demonstration in the usual ways, including inference from circumstantial evidence, . . . and a factfinder may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious. Cf. LaFave & Scott § 3.7, p. 335 ("[I]f the risk is obvious, so that a reasonable man would realize it, we might well infer that [the defendant] did in fact realize it; but the inference cannot be

conclusive, for we know that people are not always conscious of what reasonable people would be conscious of"). For example, if an Eighth Amendment plaintiff presents evidence showing that a substantial risk of inmate attacks was "longstanding, pervasive, well-documented, or expressly noted by prison officials in that past, and the circumstances suggest that the defendant-official being sued had been exposed to information concerning the risk and thus 'must have known' about it, then such evidence could be sufficient to permit a trier of fact to find that the defendant-official had actual knowledge of the risk."

511 U.S. at 842-43, 114 S. Ct. 1970 (first internal citation omitted).

Relevant to this first sub-element, the Defendants argue that the Plaintiffs must prove that Officer Avant was "personally aware of facts from which [she] could infer a substantial risk of serious harm exists *regarding the in-cell phone cords*." [104] at p. 27 (internal brackets omitted) (emphasis added). The Court disagrees. The Court is considering whether Officer Avant knew of facts from which she could infer that *Henderson* was a substantial risk to other detainees. While the Plaintiffs take issue with the presence of a phone cord in the cell and whether Henderson should have had access to the phone cord, their argument centers on the risk of Henderson himself and whether jail officials should have housed him in a cell with others. As such, the Court finds it most appropriate to consider whether Officer Avant knew that Henderson was at risk of harming others if given *any* opportunity—not only if given the phone cord. As the Defendants point out, in *Cope v. Cogdill*, 3 F.4th 198 (5th Cir. 2021), where the defendant-officials knew an inmate was at risk of committing suicide but did not know of the particular risk the in-cell phone cord posed, the Fifth Circuit held that the officials did not act with deliberate indifference. And it is true that caselaw requires that jail officials be aware of underlying facts from which they can infer a more *specific* risk than general inmate-on-inmate violence. *See Williams*, 797 F.3d at 287 ("It is also fair to infer from the record that Hampton knew there was a substantial risk, as a general proposition, that inmates in Unit 32 would attack other inmates if the opportunity arose. But a risk that inmate-on-

inmate violence has occurred and may occur again does not describe the risk in this case at the appropriate level of specificity in light of the facts of this case.").

However, in *Farmer*, the Supreme Court indicated that a prison official may be liable where he had knowledge of a substantial risk to inmate safety, without knowledge of which specific inmate would be the eventual assailant. Addressing the issue of specificity in a somewhat different context, the *Farmer* court found as follows:

> Nor may a prison official escape liability for deliberate indifference by showing that, while he was aware of an obvious, substantial risk to inmate safety, he did not know that the complainant was especially likely to be assaulted by the specific prisoner who eventually committed the assault. The question under the Eighth Amendment is whether prison officials, acting with deliberate indifference, exposed a prisoner to a sufficiently substantial "risk of serious damage to his future health," *Helling*, 509 U.S., at 35, 113 S. Ct., at 2481, and it does not matter whether the risk comes from a single source or multiple sources, any more than it matters whether a prisoner faces an excessive risk of attack for reasons personal to him or because all prisoners in his situation face such a risk. See Brief for Respondents 15 (stating that a prisoner can establish exposure to a sufficiently serious risk of harm "by showing that he belongs to an identifiable group of prisoners who are frequently singled out for violent attack by other inmates").

511 U.S. at 843, 114 S. Ct. 1970.

More applicable to the case *sub judice*, in *Hyatt*, where the defendant-official argued that the plaintiffs could not satisfy the awareness-of-risk requirement without evidence that the defendant "had some knowledge that the plastic bag Hyatt used to hang himself was present in his cell," the Fifth Circuit found that "the Hyatts are not required to demonstrate that Thomas was aware of the particular means that Hyatt would ultimately use to hurt himself, only of the substantial risk that he might try to hurt himself." 843 F.3d at 179. Therefore, if Officer Avant knew that Henderson would try to harm others if given the opportunity, the Plaintiffs need not demonstrate that she knew of the specific means that Henderson would use.

15

Against this backdrop, the Court turns to the Plaintiffs' arguments. The Plaintiffs suggest[12] that Officer Avant was aware of facts from which she could infer that Henderson was a danger, alleging in pertinent part:

> Defendant Avant, who was responsible for booking Henderson into the Clay County Detention Center, did not practice reasonable care to ensure he was safe to house in a cell with Mr. O'Neal. Specifically, *Avant failed to give proper regard to statements made by Officer Smith regarding Henderson's dangerousness, or proper regard to the booking computer printout that showed Henderson had been referred to the Chancery Court within the preceding twelve (12) months.* Additionally, Defendant Avant made no attempt to individually assess Henderson's dangerousness when booking him in to the Clay County Detention Center.

[119] at p. 11 (emphasis added).

In support of their contention that Officer Avant "failed to give proper regard" to statements that Henderson was dangerous, the Plaintiffs point to the following deposition testimony from Officer Smith who, as noted above, arrested Henderson and dropped him off at the jail:

> Q.    So, let me ask you this to make it a little bit clearer. When you make an arrest of someone, in order to protect your safety do you search that person?
>
> A.    I do.
>
> Q.    And why do you search them?
>
> A.    To make sure there's no weapons or contraband on their person.
>
> Q.    Got it. And in terms of weapons or contraband, what are some of the things that you look for?

---

[12] The Court uses the word "suggest" because the Plaintiffs do not specifically make these arguments regarding the sub-elements of deliberate indifference. But they do use the term "deliberate indifference" and allege that Officer Avant was "on notice" that Henderson was a threat. [119] at p. 12. The Court will generously construe their suggestions as arguments in support of their deliberate indifference claim.

A.    Guns, knives, any type of drugs or narcotics or paraphernalia.

Q.    Got it. And someone whose been arrested, if you find some of this contraband, a knife, a gun, or some other type of item that could be used as a weapon, is it your practice to tell the people at the detention center, Hey, watch out I took a knife off of this person or Watch out, I took a gun off of this person or Watch out, this person had some contraband. Is that your practice?

A.    Yes, sir.

Q.    Okay. And is that to warn the personnel at the detention center that this is a potentially dangerous individual?

A.    Yes, sir.

Q.    All right. And if you arrest somebody let's say and that person exhibits signs of mental illness, right, would you tell the people at the detention center that this person doesn't seem like they're right?

A.    Yes, sir.

Q.    And if someone were to be threatening, like if they threatened to harm you let's say as the arresting officer or if they threatened to harm themselves, you know, I'm going to kill myself or if they threatened that they would kill someone else, is that something that you would tell the detention center personnel?

A.    Yes, sir.

Q.    Okay. And why would you do that?

A.    To let them know what we just went through on the call.

. . .

Q.    All right. And when you arrested Mr. Henderson, he was trying to reach into his pocket. And in that pocket you found a knife. Is that correct?

A.    Correct.

Q.      All right. And it was at that point that you took Mr. Henderson into custody at the 5 Star Deli. Is that correct?

A.      I found the knife after doing a custodial search of his person.

Q.      All right. And where did you do that custodial search?

A.      Outside next to my patrol unit.

Q.      Got it. And after that, you put Mr. Henderson in your car and you drove him to the detention center, correct?

A.      Correct.

Q.      Okay. And when you got to the detention center, you told someone at the detention center about the dangerous Mr. Henderson, correct?

A.      Correct.

[118], Ex. 6 at p. 5, 9.[13]

Neither Officer Smith nor Officer Avant recall what Officer Smith told Officer Avant when he dropped Henderson off at the jail. At his deposition, Officer Smith testified as follows:

Q.      . . . Earlier, Mr. Sells asked you that you go into the booking area at the jail and there are booking officers there. And he said that these would have been the people that you would have told that Mr. Henderson had a knife or had made threats. Is that correct?

A.      Correct.

---

[13] The Plaintiffs argue that video footage from Henderson's booking would be additional evidence in support of their position, but the Defendants failed to preserve the video despite having received an evidence preservation letter dated March 21, 2019. *See* [118], Ex. 1. As such, the Plaintiffs argue that the Defendants should be sanctioned for spoliation and that an adverse inference should be drawn in their favor. *See* [119] at p. 19. The Plaintiffs also produced an affidavit of Sheriff Scott stating that even if they had preserved the video, "the Jail's video system was compromised on August 19, 2021, due to a lightning strike, which essentially wiped out all previously-recorded footage." [118], Ex. 2 at p. 2. The Defendants respond that the preservation letter requested video from March 15, 2019 (the date of the murder) forward. "The Fifth Circuit permits 'an adverse inference against the spoliator or sanctions against the spoliator *only upon a showing of bad faith or bad conduct*.'" *Berkley v. Lafayette Cnty., Miss.*, 2021 WL 6755480, at *2 (N.D. Miss. Dec. 3, 2021) (citing *Rimkus Consulting Grp., Inc. v. Cammarata*, 688 F. Supp. 2d 598, 611 (S.D. Tex. Feb. 19, 2010)) (emphasis added). The Plaintiffs' short request for sanctions makes no argument regarding bad faith and falls well short of the applicable standard necessary for a spoliation inference. The Court sees no need to address the request further.

> Q.    All right. As you sit here today, do you remember specifically telling the booking officer that those were the facts and circumstances of Mr. Henderson's arrest?
>
> A.    No, sir.

[118], Ex. 6. at p. 12.

Similarly, Officer Avant testified as follows:

> Q.    Do you recall whether or not Officer Smith said anything to you about the specifics of how Henderson was acting before he was arrested?
>
> A.    No, not to my knowledge. I don't remember him saying anything; but if he had said anything as far as that on that nature of mental hold or whatever, then I would have handled it accordingly. But at the time of the information that I received from him or whatever, I would have handled that situation the way that it was present to me when he came in.

[103], Ex. 3 at p. 31.

The Plaintiffs also suggest that Officer Avant was aware of Henderson's mental instability or dangerous propensities because the "booking computer printout" showed that Henderson had been at the Clay County Detention Center on a Chancery Court hold in September 2018. [119] at p. 22. The "booking computer printout" to which the Plaintiffs refer is a list of the detainee's booking history that is available to the booking officer who assigns detainees to cells. *See* [118], Ex. 5 at p. 13-14. At her deposition, Officer Avant gave the following testimony regarding whether, prior to placing Henderson in the cell with O'Neal, she was aware of or considered Henderson's booking history:

> Q.    Okay. Let me ask you this, In terms of the booking process, do you check at all to see whether or not a detainee has been in the Clay County Detention Center in the past?

A.    They check – a lot of time when they come in and we book they name in. A lot of time when we book them in, if they been in there more than once, then they gonna have a record of anybody that comes into that jail.

Q.    Okay. That's not my question. My question is, Whether as part of the booking process and before you assign one of these detainees into a cell, do you check to see whether the detainee was ever in the detention center in the past?

A.    When we book them in and they name comes in, they're automatically in there. So, it do let us know that they already been in there.

Q.    Okay. So, as part of the booking process, once you know that the person has already been in there, what do you do, what are you trained to do with that information?

A.    We are not trained to do anything. Because once we see the record that they been in there, it doesn't have anything to do [sic] why they coming back.

Q.    All right. So, that's what you have been told. So, you were told by the people who trained you, your supervisors or maybe the sheriff, that once you see that an inmate or a detainee that's coming in through the booking process has been in the Clay County Detention Center in the past, you do not have to check why that person was there, a history of why that person was in the detention center in the past?

A.    That is not correct, sir.

Q.    I am trying to figure out what you're saying. What do you do with the information? . . . here it is the person has been in the detention center in the past; what were you trained to do with that information?

A.    We are trained to do, we are trained to book them in. So, once we type their names in, we do look; cause they booking come up. A lot of times if you been working as long as I have in that jail, you automatically know anyway if they been there. But you still have to go through that process and look in that booking to see if they been in there. Because the one reason we do that because we don't want to book and book over. . . . So yes, when they do come in, we do check it automatically come in there. And by that process we have

to go into that insert to make sure it's not 10 or how many booking. So yes, we do look up that is part of the booking process.

. . .

Q.    . . . I'm saying you find out that the person has been in the detention center before 'cause you seen the record pop up, like you said. And in the record that you see, the person was there because they were suicidal or homicidal, they were a threat to themselves or they were a threat to other people while they were there in the past, what do you do with that information?

A.    . . . What I'm telling you that is that when they come in, we look at those booking when they come in. But people doesn't come in for the same thing. If they do come in for the same thing, we have a booking process that we go in and do insert. I focus on what they are in there for now.

. . .

Q.    All right. And one of the times that [Henderson] was in the detention center was – and you could see it – was September 26, 2018. Do you see that?

A.    Yes.

Q.    This was a Chancery Court hold that he was there for, correct?

A.    Correct.

Q.    Now, as you were booking Mr. Henderson, did you check to see what the Chancery Court hold was for?

A.    No, sir.

. . .

Q.    Got it. So now, you knew as you were booking Cameron Henderson on March 13th of 2019, you knew that he had been in the Clay County Detention Center just five months before on a Chancery hold, correct?

A.    I knew that he was in jail, yes.

21

Q.      Okay.

A.      Prior to that.

Q.      And you knew that it was a Chancery Court hold that he was in jail for, correct?

A.      I knew that he was in jail. Whether he was in jail for that Chancery hold; because a lot of them they name pop up and a lot of time it doesn't show their, I guess – I guess, you would say charges. Because a lot of time it would just show the date and time. So, a lot of time it do and a lot of time it don't –

        . . .

Q.      . . . Did you try to find out what that Chancery Court hold was for before you decided to put Mr. Henderson into Mr. O'Neal's cell?

A.      First of all, I did not place him in that cell. Second of all, I did not look; because it does not have bearing on when I was booking him in.

Q.      So, you're saying that you weren't the one that made the decision to put Mr. Henderson into Mr. O'Neal's cell?

A.      I don't know who made that decision; because I can't remember who or I did or whoever did. What I'm saying is that I had no reason to go back and look at his prior record unless something is going on and an officer come up there and ask us a prior record. But other than that, we handle case by case is what is at hand. So if he cames in on that charge then we handle what is at hand. But if he doesn't come in on that charge, then whatever charge he came in on it is according to what we have in of not on prior.

[118], Ex. 5 at p. 12-14.

Officer Avant argues that there was never evidence that she was aware that Henderson was a threat. Against this backdrop, the Court must determine if a factfinder could conclude that Officer

22

Avant was "aware of facts from which the inference could be drawn that a substantial risk of serious harm exists." *Farmer*, 511 U.S. at 837, 114 S. Ct. 1970.

In some cases, there is straightforward evidence that officials were aware of such facts. In *Purvis v. Johnson*, 78 F. App'x 377, 379 (5th Cir. 2003), where the plaintiff, who was incarcerated at the relevant time, told prison officials four times over an eight-day period that his cellmate was making racists threats against him, the Fifth Circuit found that the plaintiff alleged facts sufficient to establish the first prong of deliberate indifference.

Other cases are not so straightforward. In *Cope*, the plaintiffs brought suit after their relative Derek Monroe's 2017 death by suicide at a Texas county jail. 3 F.4th 198. The plaintiffs argued that jail officials were deliberately indifferent to inmate safety when they placed Monroe, whom they knew to be suicidal due to his attempted hanging the previous day, in a jail cell with a long phone cord. *Id.* at 210. The Fifth Circuit held that there was no evidence that the jail officials were aware of the danger of the phone cord, in part because no inmate had previously attempted strangulation with a phone cord. *Id.* at 211. The Fifth Circuit provided further reasoning in a footnote:

> In light of multiple suicides in Texas jails involving phone cords, in 2015, the Texas Commission on Jail Standards issued a memorandum recommending that phone cords in jails "be no more than twelve (12) inches in length." The phone cord in Monroe's cell is longer than the recommended length. In certain circumstances, the Supreme Court has indicated that subjective knowledge may be inferred based on circumstantial evidence. Here, however, the Commission memorandum is insufficient to support the inference that Brixley and Cogdill had subjective knowledge of the risk posed by the lengthy phone cord. Specifically, the Supreme Court has approved reliance on circumstantial evidence if the relevant risk "was longstanding, pervasive, well-documented, or expressly noted by [jail] officials in the past, and the circumstances suggest that the defendant-official being sued had been exposed to information concerning the risk and thus 'must have known about it.' There is nothing like that here and certainly no evidence that either [officer]

23

> ever received or reviewed the Commission's memorandum prior to Monroe's suicide.
>
> Further, even at the summary judgments stage, it would go too far to infer that [the officers] were aware of the Commission's recommendations simply due to their employment in the Texas jail system at the time the memorandum was written—just because information is *available* to a defendant does not mean she has been *exposed* to it. . . . Consequently, there is insufficient evidence that [the officers] were exposed to the Commission's memorandum to create a genuine dispute of material fact as to their subjective knowledge of the risk posed by the phone cord in Monroe's cell.

*Id*. at 210 n. 11 (internal citations omitted) (emphasis in original).

So, in *Cope*, jail officials did not have subjective knowledge of the risk posed by the phone cord because (1) it was not a well-documented risk at their jail and, (2) while there was an *available* memorandum documenting the risk, they had not been *exposed* to that memorandum. 3 F.4th at 210 n. 11 (emphasis in original). Here, one could argue that the jail had previously treated Henderson as a risk when he was booked on a Chancery Court hold in September 2018. Officer Avant confirmed that when an individual comes in on a Chancery Court hold, they are housed separately until they go to the doctor or appear in court—indicating that the jail considers them a potential risk. *See* [103], Ex. 3 at p. 16. Officer Avant also confirmed that she was exposed to the information that Henderson was (arguably) considered a risk when she saw in his booking history that he was previously incarcerated on a Chancery Court hold.[14]

Additionally, while neither officer recalls what Officer Smith told Officer Avant when he dropped Henderson off at the jail, Officer Smith answered affirmatively when asked if it was his

---

[14] Officer Avant stated that the booking history does not always show what "charges" an individual was previously booked on, and she stated that previous booking entry did not say what the September 2018 Chancery Court hold was for. [103], Ex. 3 at p. 13, 29. However, she stated elsewhere in her deposition that the booking sheet showed the previous Chancery Court hold that would have warranted placement in an isolated cell and that booking officers look at the previous booking entries to ensure there are no duplicate entries. *Id*. at p. 11.

practice to tell the detention center personnel that an arrestee showed signs of mental illness or that an arrestee threatened to harm themselves or kill someone else. *See* [118], Ex. 6 at p. 5. When asked if he told someone "about the dangerous Mr. Henderson," Officer Smith also answered affirmatively. *Id*. at p. 9.

If Officer Smith gave Officer Avant information indicating that Henderson was dangerous to others and exhibiting signs of mental illness or substance abuse, and Officer Avant saw that Henderson had previously been held on a Chancery Court order, a factfinder could conclude that Officer Avant was aware of facts from which she could infer that Henderson posed a substantial risk of harm.[15] Taking all of this into account and viewing the evidence in the light most favorable to the Plaintiffs, the Court finds that they have come forward with sufficient evidence to create a question of fact as to the first sub-element of deliberate indifference.

This brings the Court to the second sub-element of the deliberate indifference inquiry— whether Officer Avant actually drew the inference that a substantial risk of harm existed. *See Farmer*, 511 U.S. at 837, 114 S. Ct. 1970.

The Plaintiffs argue that Officer Avant was "on notice" from Officer Smith that Henderson was dangerous. [119] at p. 12. "The subjective test does not permit liability to be premised on obviousness or constructive notice." *Farmer*, 511 U.S. at 826, 114 S. Ct. 1970. But the Court will generously view the Plaintiffs' contention as an argument that Officer Avant inferred that Henderson was a danger. Despite the Plaintiffs' argument, the Defendants argue that she did *not* infer that Henderson was a threat, pointing to the following testimony from her deposition:

---

[15] Though neither party points it out, on Henderson's intake sheet, there are no answers to the questions "Does inmate appear to be under the influence of drugs or alcohol?" and "Any visible signs of alcohol or drug withdrawal?" *See* [103], Ex. 2 at p. 3. This contributes to the Court's finding that a factfinder *could* conclude that Officer Avant was aware of facts from which she could infer that Henderson posed a substantial risk of harm.

> But the thing is that the thing that was at hand, [Henderson] was on a misdemeanor charge and I saw that he wasn't causing a threat to me or anybody else in that jail; so he was a misdemeanor, he got placed in a misdemeanor. If I felt any other way than what I felt or at the time, I don't remember. But if I placed him in there, he wasn't a threat at that time.

[104], Ex. 3 at p. 23.

The Fifth Circuit's 2016 *Hyatt* case is an instructive example of when a booking officer actually inferred that a risk existed. In *Hyatt*, the booking officer knew that Hyatt, the detainee, came into the jail intoxicated, had a history of depression and attempted suicide, and had recently not been taking his antidepressants as prescribed. 843 F.3d at 175. While the booking officer stated that Hyatt appeared to be "happy and generally in a good mood" such that she did not consider him a suicide risk, the Fifth Circuit found that the booking officer's actions could lead a jury to conclude that she was aware that Hyatt was at risk of suicide. *Id*. at 175, 178. Specifically, the booking officer did not issue Hyatt thin bed sheets and she told her relieving officer to keep an eye on him due to his intoxication and history of suicide attempts. *Id*. at 178.

This leads the Court to examine Officer Avant's actions when booking Henderson. At her deposition, Officer Avant testified that when an arrestee enters the jail, the arresting officer gives the booking officer verbal information and a completed booking sheet that lists the applicable charges. The arrestee is patted down, given a uniform and hygiene products, and fingerprinted. The booking officer then asks the arrestee a series of medical questions. Henderson's "Booking Intake Medical Sheet" is relatively unremarkable. He reported that he had no psychiatric issues, was not taking medication, had not attempted suicide, and did not use alcohol or street drugs. *See* [103], Ex. 2 at p. 3. There are no answers to the questions "Does inmate appear to be under the influence of drugs or alcohol?" and "Any visible signs of alcohol or drug withdrawal?" *Id*. Nonetheless, Officer Avant stated that she "didn't have any reason . . . not to" believe that

Henderson's answers were truthful. [103], Ex. 3 at p. 21. Finally, unless the booking officer has a reason to believe the arrestee is a threat to himself or others, or needs to be observed for some other reason, the officer places the arrestee in a cell based on the nature of the charged offense. Thus, Officer Avant placed Henderson in a section with others arrested for misdemeanors. The booking process typically takes Officer Avant about five minutes. *See id*. at p. 30.

As the Defendants point out, Officer Avant's deposition testimony makes it clear that, upon completing the booking process, she did not believe Henderson was a threat. The Court notes that, while Officer Avant's testimony was at times not straightforward, she consistently conveyed that "each individual is different" and she assigns cells based on the individual's charges, the information from the arresting officer (including whether the officer is bringing the person in on a Chancery Court hold), and whether the person appears to be a threat to themselves or others. [103], Ex. 3 at p. 7. With respect to Henderson's booking, Officer Avant testified as follows:

> Q.   So the fact that Cam Henderson had been deemed someone who presented a threat to kill others and a threat to commit suicide, that didn't matter?
>
> A.   Sir, it's not that it doesn't matter. It matters. But my thing is to this is I didn't see anything to say otherwise that he was a misdemeanor charge. That's what his booking came in as only shoplifting, it was a misdemeanor and he was placed in a misdemeanor cell.

*Id*. at p. 22.

Officer Avant testified that she did not have a reason to look back at Henderson's previous booking history or question his answers on the medical assessment, and she did not view Henderson as a threat. *Id* at p. 21, 23. She testified that she placed him in a misdemeanor cell because he came into the jail on misdemeanor charges and "[she] didn't see anything to say otherwise." *Id*. at p. 22.

The Court finds that Officer Avant's conduct is distinguishable from the conduct at issue in *Hyatt*. As noted above, the booking officer in Hyatt acted in a manner consistent with having some concern as to a suicide risk, including not issuing the decedent thin bed sheets and directing other officials to watch him closely. The Plaintiffs have pointed to no such conduct here. Other than making passing references to Officer Avant being "on notice," they have not developed a claim that she actually inferred that Henderson presented a substantial risk of harm. In fact, Officer Avant's testimony and conduct indicate that she did not perceive such a risk.

In essence, the Plaintiffs argue that Officer Avant should have better assessed Henderson after Officer Smith put her "on notice" that he was dangerous. *See* [119], at p. 12. The Plaintiffs further argue that Officer Avant should have considered Henderson's previous booking history and that Henderson should not have been placed in a cell with a phone cord. Again, "[t]he subjective test does not permit liability to be premised on obviousness or constructive notice." *Farmer*, 511 U.S. at 826, 114 S. Ct. 1970. The Plaintiffs' repeated statements that Officer Avant was "on notice" of Henderson's violent propensities and that the Defendants' actions constituted deliberate indifference because they "failed to take reasonable measures to guarantee the safety of the Decedent" more closely resemble negligence claims than deliberate indifference claims that require subjective recklessness. [119] at p. 22; *see Farmer*, 511 U.S. at 826, 114 S. Ct. 1970 ("Subjective recklessness, as used in the criminal law, is the appropriate test for 'deliberate indifference.'"); *see also Hyatt*, 843 F.3d at 178 ("What is clear is that, even if an officer responds without the due care a reasonable person would use—such that the officer is only negligent—there will be no liability.").

The Defendants rely on *Gardner v. Cato*, 841 F.2d 105 (5th Cir. 1988) for the proposition that the Plaintiffs' claim is a negligence claim at best. *Gardner* is a short opinion wherein the Fifth

Circuit, in two sentences, found that the detainee's claim that his Fourteenth Amendment rights were violated when he was placed in a cell with a mentally unstable inmate who had access to cleaning chemicals was at best a negligence claim. The case was decided before *Farmer* clarified the deliberate indifference standard, and the opinion provides no factual background related to what risk prison officials were aware of or other relevant facts. The Court acknowledges that the case *sub judice* is very similar to *Gardne*r. However, the *Williams* case is a more recent example of where the Fifth Circuit found that a prison guard was negligent but not deliberately indifferent. 797 F.3d at 289.

In *Williams*, the prison guard, Hampton, failed to check that her block gun was loaded with a nonlethal rubber slug. *Id*. at 282. When another guard, Taylor, relieved her from watching the prison yard, Hampton took the two slugs in her pocket with her inside of the prison, believing she would be right back and believing that the block gun she left with Taylor contained one slug. *Id*. The block gun was empty. *Id*. When the guards traded places, prisoners escaped from their exercise pens and attacked each other. *Id*. at 279. The plaintiffs claimed that Hampton was deliberately indifferent to a substantial risk of inmate-on-inmate violence when she failed to ascertain if the block gun was loaded and failed to leave Taylor with the two other rubber slugs. *Id*. at 283. The Fifth Circuit disagreed, finding that "there is no evidence that Hampton knew the block gun was unloaded. Nor is there evidence from which a reasonable factfinder could draw the inference that Hampton knew the block gun was unloaded." *Id*. at 286-87. As to Hampton's failure to leave the slugs behind, the Fifth Circuit found:

> She knew that she had taken the pellets with her. It is also fair to infer from the record that Hampton knew there was a substantial risk, as a general proposition, that inmates in Unit 32 would attack other inmates if the opportunity arose. But a risk that inmate-on-inmate violence has occurred and may occur again does not describe

> the risk in this case at the appropriate level of specificity in light of the facts of this case.

*Id*. at 287.

The Fifth Circuit went on to conclude that there was no direct evidence that Hampton knew of an excessive risk to inmate safety, in part because no inmate (much less multiple inmates) had ever escaped the exercise pens and in part because "Hampton had a short span of time to reflect upon the risk presented in taking the two pellets with her inside the prison." *Id*. at 289. Without subjective knowledge of the substantial risk at issue, the Fifth Circuit found that Hampton could not have been deliberately indifferent. *Id*.

The Fifth Circuit did find, however, that "Hampton's failure to determine whether the block gun was loaded would no doubt support a finding of negligence." *Id*. at 287. Here, a factfinder could conclude that Officer Avant should have investigated Henderson further based on Officer Smith's statements. However, as noted above, "[d]eliberate indifference is an extremely high standard to meet." *Arenas*, 922 F.3d at 620 (quoting *Domino*, 239 F.3d at 756). "[T]he failure to alleviate a significant risk that an official should have perceived but did not, while no cause for commendation, cannot be condemned as the infliction of punishment." *Farmer*, 511 U.S. at 826, 114 S. Ct. 1970.

Moreover, to avoid liability, prison officials charged with deliberate indifference might show "that they knew the underlying facts but believed (albeit unsoundly) that the risk to which the facts gave rise was insubstantial or nonexistent." *Id*. at 844, 114 S. Ct. 1970. That is the gist of the evidence the Court has before it. The Plaintiffs have presented evidence that Officer Avant knew of facts from which she could infer a substantial risk, and they essentially argue that she should have perceived Henderson as a substantial risk because she was on notice of his dangerousness. For example, the Plaintiffs contend that Officer Avant "dismissed the information

30

[from Officer Smith] as irrelevant, and adopted a cookie cutter approach to inmate housing assignments." [119] at p. 12. However, where Officer Avant presents evidence that she did not actually infer from those facts that Henderson was a threat, the Plaintiffs present *no* evidence to the contrary. It is the Plaintiffs' burden to point to evidence that Officer Avant actually inferred that Henderson was a threat, and the Court has no obligation to search the record for them. *See, e.g.*, *Head v. Smith*, 2021 WL 4168390, at *2 (E.D. La. Sept. 2021) (noting that the district court "has no duty to survey the entire record in search of evidence to support a non-movant's position") (citing *Jones v. Sheehan, Young, & Culp, P.C.*, 82 F.3d 1334, 1338 (5th Cir. 1996)) (additional citations omitted). As such, the Plaintiffs are unable to create a question of fact that Officer Avant was deliberately indifferent to O'Neal's rights. To the extent the Defendants' Motion [103] seeks dismissal of the Plaintiffs' due process claim against Officer Avant in her individual capacity, it is GRANTED.[16] The claim is hereby DISMISSED.

The Plaintiffs' inability to meet their burden on their Fourteenth Amendment due process claim—the only constitutional violation they allege—is fatal to the remainder of their federal claims that each depend upon proof of a constitutional violation. *See Zarnow v. City of Wichita Falls, Tex.*, 614 F.3d 161, 167 (5th Cir. 2010) (citation omitted) ("[M]unicipal liability under Section 1983 requires proof of three elements: a policymaker; an official policy; and a violation of constitutional rights whose moving force is the policy or custom."); *see Walker*, 515 F. App'x at 339 (citing *Thompson v. Upshur Cnty.*, 245 F.3d 447, 459 (5th Cir. 2001)) (additional citation

---

[16] The Court notes that, even if a constitutional violation occurred, Officer Avant has asserted qualified immunity, and the Court would nonetheless be compelled to dismiss the claim unless the Plaintiffs demonstrate that her wrongful conduct violated clearly established law. *See Kovacic v. Villarreal*, 628 F.3d 209, 211-12 (5th Cir. 2010) ("the plaintiff has the burden to rebut this [qualified immunity] defense by establishing that the official's allegedly wrongful conduct violated clearly established law") (citation omitted). Despite the fact that they, as the Plaintiffs, bear this burden., the Plaintiffs failed to point to any cases to satisfy this burden.

omitted) ("Where, as here, plaintiffs allege that a supervisory official failed to train or supervise, they must prove that (1) the official failed to train or supervise the correctional officers, (2) a causal link exists between the failure to train or supervise and the alleged violation of the inmate's rights, and (3) the failure to train or supervise amounted to deliberate indifference. . . To hold [the supervisor] liable on account of inadequate policy, Plaintiffs must show 'that the policy itself violated federal law or authorized or directed the deprivation of federal rights or (2) that the policy was adopted or maintained by the municipality's policymakers with deliberate indifference as to its known or obvious consequences."); *see Whitley v. Hanna*, 726 F.3d 631, 646 (5th Cir. 2013) (citation omitted) ("[A]n officer may be liable under § 1983 under a theory of bystander liability where the officer (1) knows that a fellow officer is violating an individual's constitutional rights; (2) has a reasonable opportunity to prevent the harm; and (3) chooses not to act."). Therefore, the Plaintiffs' remaining claims based on the alleged Fourteenth Amendment due process violation— *Monell* liability, failure to train, supervisory liability, and failure to intervene—are hereby DISMISSED.

With all federal claims resolved, the Court turns to the Plaintiffs' state law claims.

## II.    *State Law Claims*

The Plaintiffs bring the remaining claims under Mississippi state law: negligence; negligent training, supervision, and retention; and wrongful death. The Defendants raise multiple arguments in favor of dismissal, including the Mississippi Tort Claims Act's ("MTCA") statute of limitations, notice requirement, and inmate exception.

The Plaintiffs initially argue that the Defendants waived the affirmative defenses under the MTCA. The Defendants moved to dismiss the Plaintiffs' state law claims with a Motion to Dismiss for Lack of Subject Matter Jurisdiction [108] under F. R. Civ. P. 12(b)(1) alternatively styled as

Motion to Dismiss for Failure to State a Claim under F. R. Civ. P. 12(b)(6). Citing Mississippi Supreme Court decisions, the Plaintiffs contend that the Defendants waived all MTCA defenses by (1) filing a Rule 12(b)(6) motion after their answer and (2) asserting MTCA protections in their answer but not pursuing them in the course of litigation. *See* [119] at p. 8. In response, the Defendants contend that "the Federal Rules of Civil Procedure (FRCP) govern the manner and time in which defenses are raised and when waiver occurs." [129] at p. 9 (quoting *Pardue v. Jackson Cnty., Miss.*, 2016 WL 3024153, at *7 (S.D. Miss. May 25, 2016)). The Court agrees that the Federal Rules of Civil Procedure govern this issue. *See Bryant v. Wyeth, Inc.,* 816 F. Supp. 2d 329, 332 (S.D. Miss. 2011) aff'd, 487 F. App'x 207 (5th Cir. 2012) (citing *Arismendez v. Nightingale Home Health Care, Inc.*, 493 F.3d 602, 610 (5th Cir. 2007)) (explaining that state substantive law governs what constitutes an affirmative defense, while the Federal Rules of Civil Procedure govern when defenses are raised and waived).

Further, the Defendants concede that a defendant waives an affirmative defense when it does not plead it in its first responsive pleading. However, the Defendants contend that they raised MTCA defenses and immunities in their Answer [37] when they stated:

> Insofar as any state law claims are concerned, answering defendants invoke each and every privilege, immunity, restriction and/or limitation of the Mississippi Tort Claims Act, Miss. Code Ann. § 11-46-1, *et seq.*, including but not limited to, the provisions outlined in Sections 11-46-3, 11-46-5, 11-46-7, 11-46-9, 11-46-11, 11-46-13, and 11-46-15.

[37] at p. 3.

Again citing *Pardue*, the Defendants contend that this assertion in their Answer [37] sufficiently raised MTCA defenses and therefore those defenses have not been waived. In *Pardue*, the District Court for the Southern District of Mississippi found that, where the defendants included a similar statement in their first responsive pleading, they had not waived MTCA

defenses. 2016 WL 3024153, at *7. Other courts have reached the same conclusion. *See, e.g.*, *Joiner v. Greene Cnty., Miss.*, 2020 WL 4572683, at *4 (S.D. Miss. Aug. 7, 2020) (finding no waiver where the defendant's answer raised as affirmative defense "every privilege, immunity, restriction, and/or limitation of the Mississippi Tort Claims Act"); *see also Bryant*, 816 F. Supp. 2d 329 (finding the defendant did not waive three-year statute of limitation defense where it was raised in its answer but not asserted in its motion for summary judgment until eight years later). The Plaintiffs cite no cases reaching the opposite conclusion. The Court agrees with the referenced authorities and concludes that the Defendants did not waive their MTCA defenses.

With that issue resolved, the Court turns to the Defendants' primary argument—that the Plaintiffs' state law claims are time-barred. Under the MTCA, the State of Mississippi and its political subdivisions are generally immune from suit. *See* MISS. CODE ANN. § 11-46-3. However, the MTCA waives sovereign immunity for torts committed by governmental entities or their employees acting within the course and scope of their employment. MISS. CODE ANN. § 11-46-5(1). This waiver is subject to certain conditions, including that a claimant must file a notice of claim with the governmental entity and that suit must be brought within one year from the date of the tortious conduct. MISS. CODE ANN. § 11-46-11(1), (3). Importantly, where a government employee engages in conduct constituting "fraud, malice, libel, slander, defamation, or any [non-traffic] criminal offense," the "employee shall not be considered as acting within the course and scope of his employment and a governmental entity shall not be liable." MISS. CODE ANN. § 11-46-5(2). Where a tort falls into one of these categories, it is beyond the scope of the MTCA, and the notice requirement and one-year statute of limitations do not apply. *Zumwalt v. Jones Cnty. Bd. of Supervisors*, 19 So.3d 672, 688 (Miss. 2009). Instead, torts not subject to the MTCA

generally carry a three-year statute of limitations. *See* Miss. Code Ann. § 15-1-49; *but see* Miss. Code Ann. § 15-1-35 (the statute of limitations for certain intentional torts is one year).

Here, the Defendants argue that the MTCA applies and thus the Plaintiffs were required to comply with the notice and one-year statute of limitation requirements. The Plaintiffs respond that their notice substantially complied with the MTCA's requirements, but they also make the incongruent assertion (without explanation) that the three-year statute of limitations applies. *See* [121] at p. 6. The Plaintiffs have offered no evidence suggesting that the Defendants were acting outside of the course and scope of their employment during the events at issue. Therefore, because this suit is brought against Clay County and its employees, the Plaintiffs' claims fall under the purview of the MTCA.

Again, the MTCA provides that actions shall be brought within one year after the date of the tortious conduct, "except that filing a notice of claim within the required one-year period will toll the statute of limitations for ninety-five (95) days from the date . . . the chief executive officer or other statutorily designated official of a political subdivision receives notice of claim." Miss. Code Ann. § 11-46-11(a). Once a claimant receives a notice of denial of the claim or the tolling period expires, they have an additional 90 days to file suit. Miss. Code Ann. § 11-46-11(b).

Here, O'Neal was murdered on March 15, 2019. According to the timestamp on the Plaintiff's Notice of Claim, the Chancery Court Clerk received the Plaintiff's Notice on April 8, 2019. *See* [108], Ex. 1 at p. 1. Neither party contends that the Plaintiffs received a denial of claim. This would toll the Plaintiffs' claims for the full 95 days after the Clerk received the Notice, and the Plaintiffs would have an additional 90 days to file suit that tolling period expired. Adding the tolling period and the 90 days for filing to the one-year period, the Plaintiffs had 550 days (365 + 95 + 90) from March 15, 2019 to timely file suit. *See Page v. Uni. of Southern Miss.*, 878 So.2d

1003, 1006-08 (Miss. 2004) (calculating statute of limitations in this manner); *Prystupa v. Rankin Cnty. Bd. of Supervisors*, 339 So.3d 147, 160 (Miss. 2022) (same). Therefore, the statute of limitations expired on September 15, 2020. The Plaintiffs filed their Complaint [1] on July 15, 2021, several months after the statute of limitations expired.  Consequently, the Court finds that the Plaintiffs' state law claims are time-barred. They are hereby DISMISSED.

*Conclusion*

For the reasons set forth above, the Defendants' Motions [103], [106], [108], [110] are GRANTED. All claims set forth in the Plaintiffs' Amended Complaint [33] are DISMISSED *with prejudice*. A Final Judgment consistent with the Order and Memorandum Opinion will issue this day. This CASE is CLOSED.

SO ORDERED, this the 10th day of May, 2023.

/s/ Sharion Aycock
UNITED STATES DISTRICT JUDGE